AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 4/11/2024 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ CDO _____ DEPUTY |

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| April 11, 2024 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ CLD _____ DEPUTY |

United States of America

v.

IPPEI MIZUHARA,

Defendant(s)

Case No.    2:24-mj-02125-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about June 20, 2023, in the county of Los Angeles in the Central District of California and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/* Chris Seymour
*Complainant's signature*

Chris Seymour, SA - IRS-CI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    April 11, 2024

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: Dan Boyle x12426

**AFFIDAVIT**

I, Chris Seymour, being duly sworn, declare and state as follows:

## I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, IPPEI MIZUHARA ("MIZUHARA") for a violation of 18 U.S.C. § 1344(2) (Bank Fraud).

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II.    BACKGROUND OF IRS-CI SPECIAL AGENT CHRIS SEYMOUR

3.    I am a Special Agent ("SA") with the Internal Revenue Service, Criminal Investigation ("IRS-CI"), and have served in this capacity since February 2001.  I have been trained in accounting and financial investigative techniques at the Federal Law Enforcement Training Center.  I personally have conducted and assisted in numerous investigations of criminal violations of the Internal Revenue laws, the Bank Secrecy Act, and Money

1

Laundering Control Act.  Many of these investigations focused on individuals deriving income from both legal and illegal sources and individuals preparing false federal income tax returns. These investigations have involved the use of electronic and physical surveillance; the use of informants and cooperating witnesses; undercover transactions; financial and telephone toll analysis; the preparation and execution of search warrants, and, among other things, arrests.  I have spoken with informants, suspects, and cooperating defendants, and consulted with other senior investigators concerning the methods and practices of individuals involved in the preparation of false income tax returns, income tax evasion, money laundering, identity theft, and financial crimes.  My formal education includes a Bachelor of Science degree in Business Administration, and a Master's degree in Business Administration with an emphasis in accounting.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.    Between November 2021 and January 2024, more than $16,000,000 was transferred via wire from a checking account belonging to Victim A, a professional baseball player, with an account number ending x5848 (the "x5848 Account"), held at a domestic financial institution ("Bank A").[1] These funds were transferred to bank accounts of associates of an operator of an illegal sports book ("BOOKMAKER 1").

---

[1] According to the website for the Federal Deposit Insurance Corporation ("FDIC"), Bank A is FDIC insured.

5.    In an interview with law enforcement, Victim A stated that he did not authorize these transfers from the x5848 Account.

6.    The transfers from the x5848 Account were made from devices and IP addresses associated with IPPEI MIZUHARA, an individual who was, until recently, employed as Victim A's translator and de facto manager.  Text messages on MIZUHARA's mobile phone show that in September 2021 MIZUHARA began gambling with BOOKMAKER 1's illegal sports book, and began losing substantial sums of money in late 2021.  Bank A records show that during the same time period, the contact information on the x5848 Account was changed to link the x5848 Account to MIZUHARA's phone number, and to an anonymous email account which is connected to MIZUHARA based on data found on MIZUHARA's mobile phone.

7.    Recorded phone calls produced by Bank A related to the x5848 Account show MIZUHARA falsely identifying himself as Victim A, and attempting to trick and deceive Bank A employees into authorizing wire transfers from the x5848 Account to associates of BOOKMAKER 1.

8.    Bank A records show that MIZUHARA accessed the x5848 Account pretending to be Victim A and transferred funds to associates of BOOKMAKER 1.  In particular, on June 20, 2023, MIZUHARA accessed the x5848 Account from the Central District of California pretending to be Victim A and wire transferred $500,000 to an associate of BOOKMAKER 1.

9.   Finally, on March 20, 2024, MIZUHARA sent BOOKMAKER 1 an encrypted text message admitting that he (MIZUHARA) had stolen funds from Victim A.

## IV.   STATEMENT OF PROBABLE CAUSE

10.   Based on my conversations with other law enforcement officers and investigators who participated in this investigation, my review of wire and banking records, and my own observations and knowledge of the investigation, I know the following:

**A.   The Illegal Bookmaking Investigation**

11.   IRS-CI, as well as agents of the Department of Homeland Security – Homeland Security Investigations ("HSI"), (collectively, the "Investigative Team") have been investigating illegal sports bookmaking organizations operating in Southern California, and the laundering of the proceeds of these operations through casinos in Las Vegas, Nevada.

12.   To date, these investigations have led to criminal charges and/or convictions of 12 criminal defendants and one money service business, as well as non-prosecution agreements with two Las Vegas casinos. The investigations remain ongoing and have multiple targets, not all of whom are related to each other. One such target is BOOKMAKER 1.

13.   On October 3, 2023, the Honorable A. Joel Richlin, United States Magistrate Judge, authorized a search of BOOKMAKER 1's residence, person, and cell phone.

**B.     Evidence Seized from BOOKMAKER 1 Confirmed BOOKMAKER 1's Involvement in the Operation of an Illegal Sports Bookmaking Business**

14.   I and/or other members of the Investigative Team that I have spoken with have reviewed a forensic image of a mobile phone seized from BOOKMAKER 1 during the execution of the above-referenced search warrant.   BOOKMAKER 1's phone included numerous communications indicative of the operation of a large illegal sports bookmaking business, including URL addresses for two websites that BOOKMAKER 1 used to facilitate the operation of his illegal gambling business, identified herein as Website 1 and Website 2. Based on this review, I am aware of the following:

a.    On or about November 3, 2019, BOOKMAKER 1 messaged an apparent bettor stating that he/she owed BOOKMAKER 1 $15,972, and instructed the bettor to wire the funds to an account at Bank A ending in x1911 (the "x1911 Account") in the name of BOOKMAKER 1's associate ("Associate 1").

b.    On or about November 23, 2020, an apparent bettor requested that BOOKMAKER 1 personally book his/her bets. BOOKMAKER 1 responded that this was not feasible because BOOKMAKER 1 had over 600 bettors, but sent the apparent bettor an account number, password, and URL for Website 2.

c.    On August 16, 2022, BOOKMAKER 1 messaged an apparent bettor directing them to ship $25,000 in cash to an agent of BOOKMAKER 1's bookmaking business at an address in

Colorado, as payment for gambling losses incurred by the apparent bettor.

       d.   On or about October 1, 2023, an employee at a casino located in Las Vegas, Nevada ("Casino A"), sent a group text message introducing BOOKMAKER 1 to a potential bettor.  In the group message, the Casino A employee introduced the potential bettor to BOOKMAKER 1 by telling the potential bettor that BOOKMAKER 1 "takes big action and can give you whatever u need."

**C.   Text Messages Confirm that MIZUHARA Was a Bettor with BOOKMAKER 1's Illegal Sports Book**

      15.   I and/or members of the Investigative Team that I have spoken with have reviewed a forensic image of a mobile phone belonging to MIZUHARA (the "MIZUHARA Phone").[2]  Based on a review of this image, as well as my training and experience, and review of additional messages from BOOKMAKER 1's phone, I am aware that the MIZUHARA Phone contained hundreds of pages of text messages with a phone number which I know to be associated with BOOKMAKER 1, as well as messages with a phone number I know to be associated with BOOKMAKER 1's agent or partner ("BOOKMAKER 2"). These communications between MIZUHARA, BOOKMAKER 1, and BOOKMAKER 2 include the following:

---

    [2] On March 21, 2024, HSI agents intercepted MIZUHARA at the Los Angeles International Airport after he deboarded from an international flight from South Korea and seized the MIZUHARA Phone.  MIZUHARA subsequently signed a consent form consenting to the search of the MIZUHARA Phone.

          a.    On or about September 8, 2021, BOOKMAKER 2
messaged MIZUHARA and provided MIZUHARA an account number,
password, and URL for Website 1.  Specifically, BOOKMAKER 2
assigned MIZUHARA account number "35966."

          b.    On or about September 24, 2021, MIZUHARA messaged
BOOKMAKER 2, "I've just been messing around with soccer, there's
games on 24/7 lol.  I took UCLA but they lost outright!!!"

          c.    On or about September 24, 2021, MIZUHARA messaged
BOOKMAKER 2, "How does the withdrawing and paying work?"
BOOKMAKER 2 responded later that day, "He pays and collects as
the week ends Sunday night[.]  Whatever you are up or down
Sunday night you pay or receive[.]  Last week you were down and
he rolled it as he's ok with it[.]  I say have a settle figure[.]
Meaning pick a number you want to settle at either way[.]"

          d.    On or about October 27, 2021, BOOKMAKER 2
messaged MIZUHARA, "[BOOKMAKER 1] asked me to reach out to you
. . .  he sees you playing and wants to settle this by
tomorrow[.] I can meet you or one his runners can." MIZUHARA
responded, "I'm back in Anaheim now, is there any way to pay
[BOOKMAKER 1] via credit or debit card . . . I can wire the
amount to his bank account. Do you know what bank he uses?"

          e.    On or about October 28, 2021, BOOKMAKER 2
messaged MIZUHARA "[BOOKMAKER 1] asked me if you wired[.] I told
him I wasn't sure[.] Let me know so I can tell him."

          f.    On or about October 31, 2021, MIZUHARA messaged
BOOKMAKER 2, "I had a [sic] email from my bank saying I need
more information on the recipient. They said I need [the wire

recipient's] full address including city state and zip. As soon as I give them that Info [sic], the wire will go through. . . They told me the money will be available on 11/1 for sure. Please tell [BOOKMAKER 1] I apologize for the delay . . . . I've never done a wire transfer. . . ."

g.   On or about November 2, 2021, BOOKMAKER 2 messaged MIZUHARA, "Hey [BOOKMAKER 1] asked if it was sent." MIZUHARA responded, "I tried sending it two days in a row and it keeps getting cancelled . . . . I might need to send less amount at a time . . . . can u ask him if I can send a smaller amount? Maybe like 15000 at a time? I will send it on back to back days . . . . Sorry for being a pain in the ass."

h.   On or about November 4, 2021, MIZUHARA messaged BOOKMAKER 2, "The bank wire keeps getting cancelled . . . I'm gonna use PayPal to send the money. . . . Can I please get [Associate 2's] phone number? I need to put it in the system[.] Whatever phone number he has for the [] Checking account."  The following day, MIZUHARA stated, "PayPal is not working. They said I can't send that much money since I'm in Japan right now."

i.   On or about November 6, 2021, MIZUHARA told BOOKMAKER 2, "The wire did not work. . . . do you have a [Bank A] account by any chance?  I think it's easier if it's the same bank."  Two days later, BOOKMAKER 2 provided MIZUHARA with Associate 1's bank account information at Bank A for the x1911 Account.

j.   On or about November 9, 2021, MIZUHARA told BOOKMAKER 2 that he has "tried almost every option possible and none of it is working. . . . this is super stressing."

k.   On or about November 10, 2021, MIZUHARA told BOOKMAKER 2 that he "was able to send 40k to [Associate 2]. It looks like this method word [sic] but I can only send 40k at a time."

l.   On or about November 15, 2021, MIZUHARA told BOOKMAKER 2 to tell BOOKMAKER 1 that "I'm going to send him 50k to [Associate 2]'s account again? It might take 5-7 business days."

m.   On or about December 8, 2021, MIZUHARA told BOOKMAKER 2, "I put in a request to wire 50k through xoom service via PayPal. I will let you know once they accept it."[3]

n.   On or about January 2, 2022, MIZUHARA asked BOOKMAKER 2 if BOOKMAKER 1 could "reload my account? I lost it all." BOOKMAKER 2 responded, "[BOOKMAKER 1] bumped you 50k."[4]

o.   On or about January 15, 2022, MIZUHARA told BOOKMAKER 2, "Fuck I lost it all lol . . . can you ask

---

[3] According to Xoom's website, it is a "PayPal Service" for sending money abroad.

[4] Based on my training, experience, and knowledge of the investigation, I know that "bump" is slang in illegal bookmaking to refer to increasing the credit line of a bettor who owes the bookmaker money up to their current limit. For example, a bettor who has a credit limit of $100,000, and owes the bookmaker $100,000, might ask for a "bump" up to a $150,000 limit, thus allowing the bettor to gamble further, in hopes of making up some of their losses. I also know that "bumps" are one method illegal bookmakers use to keep gamblers engaged while encouraging them to pay their balance to the bookmaker.

[BOOKMAKER 1] if he can bump me 50k? That will be my last one for a while if I lose it."

p.   On or about February 1, 2022, MIZUHARA told BOOKMAKER 2, "The wire. . . Should be there by end of tomorrow."

q.   On or about February 4, 2022, MIZUHARA told BOOKMAKER 2, "the last transaction got cancelled as well . . . I went to the teller and everything should be sorted out . . . . I made another transfer for 300k today since I lost the other 100k already" and later that day confirmed, "Wire went through!"

r.   On or about February 28, 2022, BOOKMAKER 1 messaged MIZUHARA stating "Hi [MIZUHARA]. I hope u had a great weekend. Other wire still hasn't been received. Can u just wire the 200" and then provided MIZUHARA with the x1911 Account information.  BOOKMAKER 1 then sent MIZUHARA another message stating, "I will give you the FreePlay that I was going to give to [BOOKMAKER 2] since you had such a rough stretch. Please let me know or send me a screenshot when wire sent."[5]

s.   On or about March 6, 2022, MIZUHARA messaged BOOKMAKER 1 stating, "Anyway you can bump me a little bit? I will wire you my losses on Wednesday if that is ok.  I need to wait a week to send another big wire."

t.   On or about March 10, 2022, MIZUHARA messaged BOOKMAKER 1 stating, "Thank you, can you put in 100k instead of

_____

[5] Based on my training, experience, and knowledge of the investigation, I know that "freeplay" generally refers to betting where a gambler is not required to pay for any betting loses.

300k?" BOOKMAKER 1 responded, "U mean lower credit to 100?"
MIZUHARA confirmed, "Yea, I'll get too reckless with 300."

      u.   On or about May 16, 2023, MIZUHARA messaged
BOOKMAKER 1 stating, "I sent out 500 just now.  I tried 1000 but
it won't let me for some reason. . . . I will send another 500
tomorrow or the day after."

      v.   On or about June 20, 2023, MIZUHARA messaged
BOOKMAKER 1 stating, "It looks like I can only send 500 per
week. . . . I put in a wire for 500 earlier today so it should
be in your account by tomorrow. . . . does 500/week work for
you?"

  16.   Based on my review of bank records and messages
extracted from the BOOKMAKER 1's Phone, I am aware that MIZUHARA
had his gambling winnings from BOOKMMAKER 1 deposited into his
(MIZUHARA's) personal bank account.  For example:

      a.   In or about May 2022, BOOKMAKER 1 communicated
with an associate saved in BOOKMAKER 1's phone as "[Name] Indian
Book."  Based on my training, experience, and the context of the
saved contact information, I believe this individual to be
involved in bookmaking ("BOOKMAKER 3").

      b.   On or about May 18, 2022, BOOKMAKER 3 asked
BOOKMAKER 1, "Send me wire info please."  Later that day,
BOOKMAKER 1 responded with a screenshot of wire information for
an account ending in x9877 and a message stating "Name of
account is. ippei Mizuhara."  Bank A subsequently provided
records that confirmed that the account ending in x9877 is in

fact registered in the name of MIZUHARA (hereinafter, the "MIZUHARA Account").

     c.    Based on my review of messages extracted from the MIZUHARA Phone, I am aware that on or about May 19, 2022, BOOKMAKER 1 messaged MIZUHARA, stating "I hope ur having a great day. I was just confirming that you received the ach [wire transfer] for the 47,260? Also just confirming you still want me to wire more before I do? I see your [sic] down now so Lmk? Ty bud."  MIZUHARA responded the same day, "Yes I received it, thank you very much. And no you do not need to wire anymore since I'm down again haha."

     d.    Based on my review of bank records, I am aware that on May 18, 2022, the MIZUHARA Account received a wire transfer for $47,260.

17.   After May 2022, the text messages from the MIZUHARA Phone show that MIZUHARA had a "bad run." Despite owing BOOKMAKER over one million dollars in losses, BOOKMAKER 1 continually increased MIZUHARA's betting limits.  For example, based on my review of messages extracted from the MIZUHARA Phone, I am aware that:

     a.    On or about November 14, 2022, MIZUHARA messaged BOOKMAKER 1 stating "I'm terrible at this sport betting thing huh? Lol . . . Any chance u can bump me again?? As you know, you don't have to worry about me not paying!!"

     b.    On or about December 9, 2022, MIZUHARA messaged BOOKMAKER 1 stating "Can u bump me last 200? I swear on my mom this will be the last ask before I pay it off once I get back to

the states.  Sorry for keep on asking. . . ."  BOOKMAKER 1
responded the same day stating, "Np done bud. Merry Christmas."

      c.   On May 20, 2023, BOOKMAKER 1 messaged MIZUHARA
stating "I know you've been on a bad run. I don't mind bumping
u, I just want to verify that you can send at least 2M on
June 1."

      d.   On or about June 22, 2023, MIZUHARA messaged
BOOKMAKER 1 stating "I got my ass kicked again lol . . . . Any
chance I can get one last bump? This will be my last one for a
while if I lose it. . . ."  BOOKMAKER 1 responded the same day,
"Ok bud. I just want to be able to communicate with my partner
so he knows expectations. If I can assure him that minimum 500
will be sent every week I can do the bump to whatever you want?
It's just imperative that the 500 is sent every week as you can
imagine the figures are very high and just don't want to not be
able to deliver what I tell him[.]  FYI I have already paid out
of my pocket to him half of the balance that is on the account
so whatever is lost every week I have to give him half of the
balance that's why I'm asking these direct important questions."

      e.   On or about June 23, 2023, MIZUHARA messaged
BOOKMAKER 1 stating "I'm the worst lol . . . can't catch a
break. . . . Can I get one last bump? I swear this is gonna be
my last until I get the balance down significantly . . . . I
promise this will be the last bump for a while."  BOOKMAKER 1
responded the same day, stating "Ok np. Done."

      f.   On or about June 24, 2023, MIZUHARA messaged
BOOKMAKER 1 stating, "I have a problem lol. . . . Can I get one

last last last bump? This one is for real. . . . Last one for real[.]"  BOOKMAKER 1 responded the same day, stating "Done ✓ 🍩. I have the same problem 😂. To be honest with you Ippie, as long as you can guarantee the 500 every Monday I'll give you as much as you want because I know you're good for it[.] again I just have to clean it up with my partner and that's one reason why I was asking before."

g.   On or about November 17, 2023, BOOKMAKER 1 messaged MIZUHARA stating, "Hey Ippie, it's 2 o'clock on Friday. I don't know why you're not returning my calls. I'm here in Newport Beach and I see [Victim A] walking his dog. I'm just gonna go up and talk to him and ask how I can get in touch with you since you're not responding?  Please call me back immediately."

h.   On or about November 19, 2023, MIZUHARA messaged BOOKMAKER 1 stating "I'm gonna be honest, I ended up losing a lot of money on crypto the last couple years and I took a huge hit obviously with the sports too. . . . Just wanted to ask, is there any way we can settle on an amount?  I've lost way too much on the site already . . . of course I know it's my fault."

i.   On or about December 15, 2023, BOOKMAKER 1 messaged MIZUHARA stating "I know ur busy but u Need to show some respect. I put my neck out here. Call me by Tonight. I don't care what time or how late it is."  MIZUHARA responded the same day, stating "I'm so sorry bro . . . I really don't mean to disrespect you at all I promise . . . it's just been super super busy . . . and I've got other issues on the side going on too. .

. everything has just been really really tough recently. I don't think you ever gave me the new [Bank A] account info . . . could I please get that? Imma [sic] try to send something tomorrow." BOOKMAKER 1 then messaged MIZUHARA account information for an account at Bank A with an account number ending x1530 (the "x1530 Account").

        j.   On or about January 6, 2024, BOOKMAKER 1 messaged MIZUHARA stating "you're putting me in a position where this is going to get out of control. If I don't hear from you by the end of the day today it's gonna [sic] be out of my hands." MIZUHARA responded the same day, stating "My bad man. . . . I just got back from Japan two days ago and I'm leaving tomorrow again . . . I'll be back in mid January. To be honest with you, I'm really struggling right now and I need some time before I start to make payments."

**D.   MIZUHARA's Betting Records Show MIZUHARA Lost Millions of Dollars Betting with BOOKMAKER 1**

        18.   A source in BOOKMAKER 1's organization is cooperating with law enforcement and provided the betting history for account 35966 for the period December 2021 through January 2024.[6] As previously described, I understand that MIZUHARA was assigned betting account number 35966 based on text messages found on MIZUHARA's Phone.

_____

        [6] The source has not yet been charged for his role in the illegal gambling business, but I believe he is cooperating with law enforcement in hopes of receiving benefits at the time of sentencing on any future charges.

19.   I have reviewed an Excel spreadsheet with the betting history for account 35966 (the "35966 Records") provided by the cooperating source for the period December 2021 through January 2024.[7]  Based on this review of the 35966 Records, I am aware of the following:

        a.   The 35966 Records reflect approximately 19,000 wagers between December 2021 and January 2024, and nearly 25 bets per day on average.  The wagers reflected in the 35966 Records ranged in value from roughly $10 to $160,000 per bet, with an average bet amount of roughly $12,800.  During this period, the 35966 Records reflect total winning bets of $142,256,769.74, and total losing bets of $182,935,206.68, leaving a total net balance of negative $40,678,436.94.[8]

        b.   The 35966 Records do not reflect any bets on baseball games.

**E.   Account Records for the x5848 Account Show Millions of Dollars in Wire Transfers and Transactions**

20.   I and/or members of the Investigative Team that I have spoken with have reviewed bank statements for the x5848 Account for Victim A.  Based on my review of these bank records, I am aware of the following:

---

[7] Based on my training, experience, and knowledge of this investigation, I know that illegal sports books typically keep records only under anonymous assigned numbers rather than under bettors' names.

[8] As noted above, some of this betting activity may have been so-called "freeplay" and thus not counted against the bettor's actual losses, but based on my review of the messages between BOOKMAKER 1 and MIZUHARA extracted from the MIZUHARA Phone, I believe that total freeplay was less than $500,000.

a.   The x5848 Account was held in the name of Victim A and was opened in or about March of 2018.

b.   The x5848 Account was almost exclusively funded by deposits identified as payroll, in the name of a Major League Baseball ("MLB") club located in Southern California, for which Victim A played baseball during this time period.

c.   On November 15, 2021, the x5848 Account posted a debit transaction for $40,010 to Xoom.com, a PayPal service. Based on my training, experience, and knowledge of this investigation, I believe this was the first unauthorized wire transfer from the x5848 Account by MIZUHARA.  Based on the timing and amount of this transfer, I believe it reflects the transaction discussed in the text message from MIZUHARA to BOOKMAKER 2 discussed above.

d.   Between February 2022 and October 2023, the x5848 Account wired at least $15,000,000 to the x1911 Account. Certain of these wires coincided with communications between MIZUHARA and BOOKMAKER 1 where MIZUHARA stated that he (MIZUHARA) had recently wire transferred funds to the x1911 Account.  For example:

i.   On November 15, 2021, $40,010 was wire transferred from the x5848 Account to Xoom.com.  As noted above in paragraph 15(k), on or about this date, MIZUHARA told BOOKMAKER 1 that he (MIZUHARA) had initiated a wire for $40,000.

ii.   On or about May 16, 2023, $500,000 was wire transferred from the x5848 Account to the x1911 Account.  As

17

noted above in paragraph 15(u), on or about this date, MIZUHARA told BOOKMAKER 1 that he (MIZUHARA) had initiated a wire for this same amount.

        iii. On or about June 20, 2023, $500,000 was wire transferred from the x5848 Account to the x1911 Account. As noted above in paragraph 15(v), on or about this date, MIZUHARA told BOOKMAKER 1 that he (MIZUHARA) had initiated a wire for this same amount.[9]

        e.  Between December 15, 2023, and January 8, 2024, the x5848 Account wired more than one million dollars to the x1530 Account, for which, as discussed above (see supra paragraph 17(i), the account information was provided by BOOKMAKER 1 to MIZUHARA via a December 15, 2023 message following MIZUHARA's claim that he would initiate a wire to pay down his balance to BOOKMAKER 1 on the same day.

        f.  I also observed numerous transactions at eBay and Whatnot from the x5848 Account. Specifically, I counted more than $325,000 in funds transferred from the x5848 account to eBay and Whatnot between January and March 2024.[10]

---

[9] Based on public records, I am aware that MIZUHARA and Victim A were in the Central District of California on this day for a baseball game.

[10] According to its website, Whatnot is an online marketplace where users can purchase products, e.g., baseball cards.

**F.    Account Records Produced by Bank A Connect MIZUHARA to the Transfers from the x5848 Account**

21.    I and/or members of the Investigative Team that I have spoken with have reviewed account records for the x5848 Account produced by Bank A.  Based on my review of these account records, I am aware of the following:

a.    The signature card for the x5848 Account identifies Victim A as the only signatory on the x5848 Account.

b.    MIZUHARA also maintains an account at Bank A in his own name (the MIZUHARA Account).

c.    Between October 2021 and February 18, 2024, Bank A call logs identified multiple calls received from a telephone number ending in x0373 regarding both the x5848 Account and the MIZUHARA Account.  Based on my review of the MIZUHARA Phone, I know that this same telephone number is assigned to the MIZUHARA Phone.

d.    Bank A maintains login information for devices which access Bank A accounts through the internet.  Between 2018 and October 27, 2021, there was no online access activity for the x5848 Account; however, approximately one month after MIZUHARA was granted access to BOOKMAKER 1's gambling website, on October 27, 2021 (the same day BOOKMAKER 2 messaged MIZUHARA that BOOKMAKER 1 wanted to settle MIZUHARA's losses, see supra paragraph 15(d)), the x5848 Account was accessed through the internet for the first time since 2018.  Approximately two weeks later, between November 9-15, 2021, the x5848 Account was repeatedly accessed through the internet.

e.    Each device that is used to access a Bank A account through the internet is assigned a unique identification number by Bank A's systems (a "DeviceID").  Bank A also logs the internet protocol address (an "IP address")[11] used by that specific device for each login.

f.    Between 2021 and March 2024, Bank A recorded several unique DeviceIDs accessing both the x5848 Account and the MIZUHARA Account within days of one another.  These instances include:

i.    Between October 30, 2021, and November 3, 2021, a device that Bank A designated as DeviceID 647519282 (the "9282 DeviceID") accessed the MIZUHARA Account multiple times. The 9282 DeviceID also accessed the x5848 Account multiple times between October 27, 2021, and May 5, 2023.

ii.    Between February 4, 2022, and March 24, 2022, the 9282 DeviceID accessed the x5848 Account and transferred $900,000.00 using IP address 70.166.204.194.  This same IP address was also used to access the MIZUHARA Account between February 25, 2021, and March 31, 2022.

iii. Between April 27, 2022, and June 27, 2022, the 9282 DeviceID transferred $1,200,000.00 from the x5848

---

[11] Based on my training and experience, I know that an IP address is a unique identifying number assigned to a device that is connected to the internet through a network which allows devices on a network and the internet to differentiate between one another. I also know that a device's IP address will often change when a device switches between different networks or even when a device disconnects and reconnects to a single network. For this reason, a DeviceID assigned by Bank A to a single device may be associated with different IP addresses at different periods in time.

Account using IP address 136.52.16.173.  This IP address was also used to access the MIZUHARA Account between April 7, 2022, and February 7, 2024.  Furthermore, according to the betting history in the 35966 Records, approximately three wagers totaling $233,386.00 were made on October 26, 2023, using this same IP address.

G.    **MIZUHARA Lied to Bank A Employees to Circumvent Bank A's Security Procedures and Execute Wires From the x5848 Account**

22.  I and/or members of the Investigative Team that I have spoken with have reviewed recordings of phone calls disclosed by Bank A. Based on a review of these recordings, I am aware of the following:

a.    On or about February 2, 2022, MIZUHARA called Bank A, using the x0373 phone number associated with the MIZUHARA Phone, and attempted to access the x5848 Account to wire funds.  During this call, MIZUHARA falsely identified himself as Victim A,[12] and falsely stated that he was attempting to wire funds to BOOKMAKER 2 for a car loan.  This request was unsuccessful, and Bank A froze online transactions for the x5848 Account.

b.    On another call on the same day, a different Bank A employee spoke with MIZUHARA, using the x0373 phone number

---

[12] I recognized MIZUHARA's voice based on a recording of an attempted interview of MIZUHARA on or about March 21, 2024, at Los Angeles International Airport, which I have reviewed. Moreover, x5848 Account's owner Victim A does not speak English fluently, while the caller spoke fluent English.

associated with the MIZUHARA Phone, regarding the suspension of online banking on the x5848 Account.  During this call, MIZUHARA again falsely identified himself as Victim A, and responded to security challenge questions by giving the Bank A employee biographical information for Victim A.  As a result of this call, MIZUHARA was able to successfully lift the online banking suspension on the x5848 Account.

       c.  On or about February 4, 2022, a different Bank A employee spoke with MIZUHARA, using the x0373 phone number associated with the MIZUHARA Phone, in order to verify a new attempted wire transfer of $300,000 from the x5848 Account to BOOKMAKER 2.  During the call, MIZUHARA again falsely identified himself as Victim A.

23.  Bank A records show that the registered phone and email address for the x5848 Account were the x0373 phone number associated with the MIZUHARA Phone and an anonymous Gmail email account ("Email Address 1").  As part of my review of the forensic image of the MIZUHARA Phone, I know the following:

       a.  As discussed above, the phone number ending x0373 is associated with the MIZUHARA Phone; and

       b.  Email Address 1 was associated with information found on the MIZUHARA Phone.  Specifically, cookies[13] on the

---

[13] Based on my training and experience, I know that "cookies" are files containing identifying data that are used to identify a device connected to a network, in order to identify specific users and allow a server to send information to that device specially intended for that user. For example, if a user permits cookies to be stored on a device, a website may recognize a device that has previously connected to that

MIZUHARA Phone associated Email Address 1 with a PayPal account found on the MIZUHARA Phone.

c.    Email Address 1 has a similar format and numbering to Victim A's actual email address.[14]

## H.    Victim A Denied Giving MIZUHARA Access to the x5848 Account or Approving the Wires from the Victim Account

24.    On April 2 and 3, 2024, I and the other members of the Investigative Team interviewed Victim A, who was assisted by a court-certified Japanese-language interpreter.  Based on Victim A's statements during that interview, as well as my knowledge of the investigation, I am aware of the following:

a.    Victim A first met MIZUHARA in approximately 2013 while Victim A was playing professional baseball in Japan.

b.    Towards the end of 2017, Victim A came to the United States from Japan to play baseball for an MLB club in Southern California.  Victim A did not speak English at that time, and speaks only limited English at present.

c.    When Victim A's intent to transfer to MLB became public, MIZUHARA contacted Victim A and offered to be Victim A's translator in the United States.

d.    After arriving in the United States, MIZUHARA was employed by Victim A's MLB club as a translator for Victim A.

---

website, and provide that user with information that incorporates their prior interactions with the website.

[14] I and/or members of the Investigative Team I have spoken with have been informed of Victim A's actual email address by Victim A's counsel.

In this capacity, MIZUHARA's responsibilities were to translate for Victim A.

e.   In addition, Victim A separately employed MIZUHARA to act as a de facto manager and assistant for Victim A.  In this capacity, MIZUHARA would drive Victim A, handle daily tasks for Victim A, and translate and manage certain of Victim A's business and personal matters outside of MLB.

f.   In or about 2018, MIZUHARA accompanied Victim A to a Bank A branch in Arizona to assist Victim A in opening the x5848 Account, and translated for Victim A when setting up the account details.

g.   Victim A's salary from playing professional baseball was then deposited into the x5848 Account.

h.   Victim A received additional income from numerous sources, including endorsements and investments; however, those funds are not deposited into the x5848 Account.

i.   Victim A's domestic endorsements and related income were managed by Victim A's sports agent ("Agent 1"), a professional bookkeeper retained by Agent 1 (J.C.), a financial manager (B.L.), and a professional tax preparer and accountant (K.F.).

j.   MIZUHARA always accompanied Victim A to meetings with Agent 1.  MIZUHARA also accompanied Victim A to meetings with Victim A's accountants and financial advisors, but Victim A recalled that there were only one or two such meetings.  None of Victim A's agents, accountants, or financial advisors spoke

Japanese and Victim A relied on MIZUHARA to translate the conversations with those individuals.

k.   Victim A stated that he believed that Agent 1, his accountants, and financial advisors were monitoring all of his accounts, including the x5848 Account.

l.   Because Victim A received income from a range of both foreign and domestic sources, Victim A generally would not ask MIZUHARA to inquire about specific accounts, and instead, would ask MIZUHARA to inquire with the above-identified financial professionals for an overall picture of his income or investment profile.

m.   Victim A never authorized any wires to the x1911 Account or to Associate 1, BOOKMAKERS 1, 2, or 3, or the named accountholder on the x1530 Account.

n.   Victim A never gave MIZUHARA control over any of Victim A's financial accounts, including the x5848 Account.

o.   Victim A stated that he did not recognize Email Address 1 that was listed as the primary email address for the x5848 Account.

p.   The first time Victim A learned that MIZUHARA had gained access to the x5848 Account was on or about March 20, 2024, after an MLB game in Seoul, Korea.  Following the game, Victim A's team was assembled by team management in the locker room, and members of team management addressed the players, followed by MIZUHARA addressing the entire team, in English.  No one translated what was said at this meeting to Victim A, and he did not understand most of what was said in English, but Victim

A was able to understand there was an issue involving MIZUHARA. Following the team meeting, Victim A asked MIZUHARA what the issue was, and MIZUHARA told Victim A that they needed to speak privately.

       q.   Victim A and MIZUHARA then spoke at the team's hotel later that evening. During that conversation at the hotel, MIZUHARA disclosed to Victim A for the first time that MIZUHARA had substantial debts from illegal gambling, and that MIZUHARA had been paying his bookmaker with funds from the x5848 Account. MIZUHARA also told Victim A during that meeting that MIZUHARA had falsely told Agent 1 and others that Victim A had agreed to loan MIZUHARA money to pay his (MIZUHARA's) gambling debts.

**I.    Professionals Working for Victim A Confirmed that MIZUHARA Denied Them Access to the x5848 Account**

    25.  I and the other members of the Investigative Team also interviewed the above-identified financial professionals working for Victim A.

    26.  On or about March 25, 2024, I and/or other members of the Investigative Team I have spoken with interviewed Agent 1, and based on this interview, I am aware of the following:

       a.   Agent 1 is a professional sport agent and does not speak Japanese.  Agent 1 works for a talent and sports agency based in Los Angeles.

       b.   Agent 1 has represented Victim A since approximately 2018.

c.   In addition to negotiating sports contracts for Victim A, Agent 1 also negotiates domestic endorsements and other business deals for Victim A.

d.   Agent 1's agency does not employ any individuals who speak Japanese, but Agent 1 will occasionally hire Japanese-language interpreters to communicate with his clients.

e.   Agent 1 did not hire an interpreter to communicate with Victim A because MIZUHARA always accompanied Victim A.

f.   Agent 1 did not speak directly to Victim A or regularly exchange text messages with Victim A.  Instead, Agent 1 relayed messages to Victim A through MIZUHARA.

g.   Agent 1 retained and oversaw financial professionals to manage Victim A's domestic income, both from playing baseball and from endorsements.

h.   Agent 1 was aware of the x5848 Account and asked MIZUHARA on multiple occasions about the account.  MIZUHARA told Agent 1 that the x5848 Account was "private" and that Victim A did not want anyone else to monitor that account.  Agent 1 stated that he did not confirm these representations directly with Victim A, but stated that he had no reason not to believe MIZUHARA.

27.  On or about March 29, 2024, I and/or other members of the Investigative Team I have spoken with interviewed witness J.C., and based on this interview, I am aware of the following:

a.   J.C. is a professional bookkeeper employed by Agent 1 to keep track of Victim A's business accounts.

27

b.    J.C. monitors a range of Victim A's business accounts, executes transactions as directed by Agent 1, and collects and distributes materials and documents needed to prepare Victim A's taxes.

c.    J.C. was familiar with a number of Victim A's business accounts, and expressed familiarity with the balances, operations, and transactions in those accounts.

d.    J.C. was generally aware of the x5848 Account, but stated that he/she had never been given access to this account, and did not know its balance or have any insight into activity in this account.

e.    J.C. was concerned that the lack of access to the x5848 Account created possible tax liability for Victim A if the x5848 Account accrued unreported interest or was used to make gifts in amounts necessary to be reported to the IRS.  When J.C. inquired with Agent 1 about gaining oversight over the x5848 Account for tax preparation purposes, Agent 1 informed J.C. that MIZUHARA had stated that Victim A wanted the x5848 Account kept private and that he understood that the x5848 Account did not accrue interest or make gifts.

28.  On or about April 1, 2024, I and/or other members of the Investigative Team interviewed witness B.L.  Based on this interview, I am aware of the following:

a.    B.L. is a professional financial adviser and was retained by Agent 1 to manage Victim A's domestic investments and assets.

b.   B.L. has been working for Victim A for
approximately five years.

c.   B.L. does not manage Victim A's Japan-based
investments or assets.

d.   While B.L. oversaw most of Victim A's domestic
accounts and investments, B.L. was never given access to or
information about the x5848 Account.

e.   B.L. asked Agent 1 for information about any
funds held in the x5848 Account so that those funds could be
considered in Victim A's overall investment profile, but Agent 1
informed B.L. that MIZUHARA had stated Victim A considered the
x5848 Account private and did not want anyone else to view that
account.

29.   On or about April 1, 2024, I and/or other members of
the Investigative Team I have spoken with interviewed witness
K.F., and based on this interview, I am aware of the following:

a.   K.F. is an accountant and was retained by Agent 1
to prepare and file Victim A's domestic taxes.

b.   K.F. only met Victim A one time, for an
introductory meeting, and otherwise received all instructions
from Agent 1 or MIZUHARA.

c.   While K.F. received information about most of
Victim A's accounts and investments in order to prepare Victim
A's tax returns, including Victim A's Japan-based assets, K.F.
was never given information about the x5848 Account.

d.   In or about October of 2022, K.F. was scheduled
to meet with Victim A and MIZUHARA, but only MIZUHARA arrived

29

for the meeting.  MIZUHARA stated that Victim A was sick, and
unable to join the meeting.  During that meeting, K.F. asked
MIZUHARA about the x5848 Account, and stated that Victim A
risked filing incorrect tax returns if there was interest being
generated by any funds in the x5848 Account or any gifts from
that account which triggered tax reporting requirements.
MIZUHARA responded that Victim A wanted the x5848 Account kept
private from everyone, and that the x5848 Account did not bear
interest and that there were no gifts from the x5848 Account.

**J.  Memorabilia Connected to Purchases From the x5848 Account
      was Mailed to MIZUHARA Under a Pseudonym**

30.  I and/or other members of the Investigative Team that
I have spoken with interviewed an employee of Victim A's current
MLB club ("Club Employee 1").  Based on this interview of Club
Employee 1, I am aware of the following:

a.  Club Employee 1 works in the team's clubhouse and
at times handles mail sent to the team and players.

b.  MIZUHARA spoke to Club Employee 1 in or about
January 2024, and asked that Club Employee 1 receive and set
aside packages which were going to be mailed to the clubhouse
for MIZUHARA under an alias.

c.  Based on my review of the MIZUHARA Phone, I know
that the MIZUHARA Phone was used to access an email account and
websites under the name "JayMin" according to cookies saved on
the device.

31.  I have inspected multiple packages which were received
by Club Employee 1, and addressed to "Jay Min" and Club Employee

1.  Certain of these package had already been opened when I received them.  Inside of these packages were baseball cards which appeared to be in protective cases for collecting.

32.  With consent from MIZUHARA and his counsel, I have also taken possession of several additional briefcases and boxes that were found inside a vehicle used by MIZUHARA.  Inside the briefcases and boxes were additional baseball cards, including cards for baseball players Yogi Berra, Juan Soto, and Victim A. The Investigative Team is still attempting to inventory all of the baseball cards but I estimate that there were approximately 1,000 baseball cards in the briefcases and boxes.

33.  As described above, I reviewed the x5848 Account and observed approximately $325,000 in transactions at eBay and Whatnot between January and March 2024.  I understand that both websites are frequently used to buy and sell baseball cards, among other items.  Based on my training, experience, and knowledge of this investigation, I believe that MIZUHARA used the x5848 Account to purchase the above-described collectible baseball cards from eBay and Whatnot with the intent to resell them at a later date.

K.    **MIZUHARA Falsely Stated to the Press that Wires From the x5848 Account Were a Loan from Victim A to MIZUHARA**

34.  I am aware of press reports that MIZUHARA told an ESPN reporter that Victim A had agreed to pay MIZUHARA's gambling debts. I do not find MIZUHARA's statements to be credible for the following reasons:

a.    As noted above, I and/or members of the Investigative Team that I have spoken with have reviewed an extraction of the MIZUHARA Phone, which contained voluminous messages between Victim A and MIZUHARA in Japanese. An HSI Special Agent who is a fluent and native speaker of the Japanese language reviewed approximately 9,700 pages of text messages between Victim A and MIZUHARA between 2020 and 2024. Based on his review, I am aware of the following:

i.    There was no discussion of sports betting between MIZUHARA and Victim A in the MIZUHARA Phone.

ii.    There was no discussion between MIZUHARA and Victim A that mentioned BOOKMAKERS 1, 2, or 3, Associate 1, or the named accountholder of the x1530 Account.

iii.    There was no discussion between MIZUHARA and Victim A of odds, wagering, or any other reference which might indicate Victim A's knowledge of MIZUHARA's gambling with BOOKMAKER 1.

iv.    There was no discussion of keeping the x5848 Account private or any direction by Victim A that information about the x5848 Account should not be disclosed to Agent 1 or any of the above-identified financial advisers for Victim A.

b.    As detailed above, I have also reviewed recorded calls in which MIZUHARA falsely represented himself as Victim A to Bank A employees on multiple occasions in order to execute wire transfers from the x5848 Account.  I do not find it credible that MIZUHARA would have made repeated false statements to Bank A employees by pretending to be Victim A if Victim A was

aware of and authorized these wires.  If that were the case,
Victim A and MIZUHARA could have executed the transfers from a
Bank A branch, or added MIZUHARA as an authorized signer on the
x5848 Account.

      c.   I have also obtained gambling records from legal
gambling casinos and websites, including MGM, DraftKings, and
FanDuel.  All three companies found records and a history of
gambling for MIZUHARA, but found no records for Victim A.

      d.   As detailed above, the contact email on the x5848
Account was changed to Email Address 1, which Victim A did not
recognize and which was linked to the MIZUHARA Phone.

      e.   Bank records for the x5848 Account show that the
first wire to BOOKMAKER 1's associates occurred in November
2021, and the final wire, to the x1530 Account, occurred in
January 2024. I do not find it credible that Victim A would have
repeatedly authorized wire transfers to MIZUHARA while MIZUHARA
continued incurring gambling debts to BOOKMAKER 1 for nearly two
years. Further, I do not find it credible that Victim A would
have agreed to pay MIZUHARA's gambling debts from the x5848
Account while allowing MIZUHARA to deposit the winnings from his
gambling into MIZUHARA's bank account.

    **L.   Victim A Provided Consent to Law Enforcement to Search
His Phone**

35.  On March 25, 2024, Victim A provided consent to law
enforcement to search his phone.  An HSI Special Agent who is a
fluent and native speaker of the Japanese language that I have
spoken with reviewed a forensic image Victim A's phone and did

not find any evidence to suggest that Victim A was aware of, or involved in, MIZUHARA's illegal gambling activity or payment of those debts.  Specifically, he found the following:

      a.    There was no evidence that Victim A's phone had accessed the x5848 Account online.[15]

      b.    Victim A's browser history did not contain any evidence that Victim A had ever accessed the gambling websites used by BOOKMAKER 1 -- Websites 1 and 2.

      c.    Victim A's text messages did not contain any messages that discussed sports betting or MIZUHARA's gambling debts.

      d.    Victim A's text messages did not contain any messages with BOOKMAKERS 1, 2, or 3, Associate 1, or the named accountholder of the x1530 Account.  I also found no messages that referenced BOOKMAKERS 1, 2, or 3, Associate 1, or the named accountholder of the x1530 Account.

**M.    MIZUHARA Admitted to Stealing Funds From Victim A**

36.    As part of my review of the forensic image of the MIZUHARA Phone, I reviewed encrypted messages transferred via the "Signal" messaging application.[16]  Based on my review of these encrypted messages, I am aware of the following:

---

[15] Based on my interview of Victim A and my review of the image of Victim A's phone, I know that this device had been used by Victim A since at least early 2023.

[16] Based on my training and experience, I am aware that "Signal" is an application which can be installed on most smartphones which allows encrypted messaging between users of the application.  Messages sent via Signal are end-to-end encrypted, which means they generally cannot be intercepted in transit (for example, by means of a wiretap order), but can be

      a.   On or about March 17, 2024, MIZUHARA messaged BOOKMAKER 1 stating "Thank you for the call earlier. . . . Do you think there is any way to find out the details of the article that's coming out on LA Times?" BOOKMAKER 1 responded to MIZUHARA the same day, stating "Hey bud, of course Ty for calling me. I have no idea what this idiot is printing or trying to say. I've never spoke to him and wasn't willing to talk to him although he tried[.] And all my attorney did was give him those facts I told you and told him the rest she won't talk about and can't confirm or deny anything. He did say his source was the FBI but I don't even know if that's true."[17]

      b.   On or about March 20, 2024, MIZUHARA messaged BOOKMAKER 1 stating, "Have you seen the reports?" BOOKMAKER 1 responded, "Yes, but that's all bullshit. Obviously you didn't steal from him. I understand it's a cover job I totally get it." MIZUHARA then responded to BOOKMAKER 1, "Technically I did steal from him. it's all over for me."
//
//
//

_____

viewed by law enforcement if an end user's phone is unlocked and seized.  In this case, MIZUHARA gave consent to search the MIZUHARA Phone and provided a passcode, allowing the Investigative Team to obtain his Signal messages.

   [17] Based on my knowledge of this investigation, I know that the Federal Bureau of Investigation is not involved in this investigation.

## V.    <u>CONCLUSION</u>

37.   Based on the foregoing, there is probable cause to believe that MIZUHARA has committed bank fraud in violation of 18 U.S.C. § 1344(2).

/S/ CHRIS SEYMOUR
_____
CHRIS SEYMOUR, Special Agent
Internal Revenue Service


Sworn before me by telephone in accordance with the requirements of Fed. R. Crim. P. 4.1 on April 11, 2024.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE